*in the matter of the*
# ARBITRATION
*between*

**INTERNATIONAL BROTHERHOOD OF
TEAMSTERS CHAUFFEURS & HELPERS**
   Local No. 726

and

**CHICAGO TRANSIT AUTHORITY**

                                                  Grievance No. 7210-05
                                                  Peter Demos – Termination

DECISION AND AWARD
of
John C. FLETCHER, Arbitrator
June 6, 2006

This matter came to be heard in the Lake Street offices of the Chicago Transit Authority on January 26, 2006 and March 2, 2006. The Chicago Transit Authority ("CTA" or "the Authority") was represented by:

> Carole A. Corns, Esq.
> Chief Attorney – Law Department – Labor
> 567 West Lake Street,
> Chicago, Illinois 60661-1498

The Grievant, Mr. Peter Demos and Teamsters Local No. 726 ("the Union" or "Local 726") was represented by:

> James W. Green, Jr., Esq.
> 230 West Monroe Street, Suite 2600
> Chicago, Illinois 60606

Following the conclusion of the evidentiary hearing the counsel for the parties prepared briefs that were exchanged by the Arbitrator on May 17, 2006.

### Background:

Pursuant to the terms of the Collective Bargaining Agreement in effect between the CTA and the Union at the time events giving rise to this grievance occurred, the parties submit the

**EXHIBIT A**

IBT-726 & CTA
Grievance No. 7210-05
Peter Demos – Termination

matter concerning the termination of Peter Demos ("Demos") to the Arbitrator for final and binding determination.

Demos entered the employ of the CTA in 1995, and was assigned as a Service Truck Chauffeur at the time of his discharge on April 27, 2005. As a Service Truck Chauffeur, Demos was responsible for transporting laborers and/or equipment to various work locations on CTA property during his day shift hours of 7:00 a.m. and 3:30 p.m. (Tr. 24.)

On April 13, 2005, the date giving rise to the instant dispute, Demos punched in at CTA's West Shops, at 6:52 a.m. The record establishes that that morning, CTA laborers were conducting a biannual job "pick" at West Shops which was expected to last approximately two hours. Therefore Demos' services as a chauffeur were not immediately needed. According to evidence not in dispute, Demos parked his CTA truck on West Lake Street where work crews normally assemble, then got into his personal vehicle and drove to the area of 2701 West Madison Street where he was arrested by undercover Chicago Police Officers and subsequently incarcerated for soliciting a prostitute. It is also not disputed that Demos failed to notify CTA management of his whereabouts that day, though at approximately 6:30 in the evening he returned to West Shops and explained to the supervisor on duty that he had experienced symptoms of a heart attack that morning and had gone home. Demos also contacted his manager by telephone, and told him the same story. Demos informed his manager that he would not be in the following day, April 14th, because he planned to see his doctor.

Demos returned to work on the morning of April 15th, and was asked by Timothy Carduff, Utilities Department Senior Coordinator, to submit an Unusual Occurrence Report explaining his unauthorized absence on April 13th. Demos complied, stating the following reasons for leaving work without permission:

IBT-726 & CTA
Grievance No. 7210-05
Peter Demos – Termination

> Was at my car getting wallet when started to feel sick tight chest pain, sweating, I thought I was having a heart attack – I panicked and left [West Shops].

Carduff accordingly cited Demos for violating General Rules 12 (e), 14 (i) and (w), and for "poor job performance" on the basis that he had left his assigned CTA vehicle unattended and subsequently used his private vehicle on company time, and issued him a Final Written Warning pursuant to CTA Corrective Action Guidelines. However, CTA management later received information that Demos had really been arrested for solicitation on April 13th, and was incarcerated for several hours

Demos ultimately changed his story and admitted that he had been arrested for soliciting a prostitute, though he steadfastly maintained his innocence of all criminal activity. This time, Demos explained to Manager of Labor Relations Eugene Jendrach, that after punching in on April 13th, he had gone for coffee and realized that he had left his wallet in his car. Demos asserted that while retrieving it, he began to feel ill with symptoms of a heart attack, and consequently decided to get into his vehicle and drive 45 minutes to his home in Justice, Illinois "to get his cholesterol pills". Demos then told Jendrach that he was proceeding to the expressway entrance ramp when he spilled coffee on his leg and was forced to pull over to the side of the road. That is when, according to Demos, a woman approached his car and asked him if he wanted a "date". Demos insisted (to Jendrach) that he forcefully declined the offer, but was nonetheless arrested and incarcerated for solicitation. In response to Jendrach's inquiries, Demos did not explain why he had not called for paramedics, why he had not contacted anyone at West Shops to let them know he was leaving, or why he had driven 12 blocks east when there was an entrance ramp much closer to West Shops than the location where he was ultimately arrested. Demos did admit to Jendrach that he initially lied about having gone home, and further that he

had not been truthful when he completed the required Unusual Occurrence Report. However, explained Demos, he was embarrassed and fearful as a result of the incident, and thus lied to protect himself from the ridicule of his coworkers and the wrath of his girlfriend.

On April 18, 2005, Jendrach wrote to CTA General Manager Robert Degnan formally recommending Demos' discharge for the following reasons:

> On April 18, 2005 Service Truck Chauffeur, Peter Demos was interviewed at the West Shops concerning a serious behavioral violation that occurred on April 13, 2005 and Friday, April 15, 2005.
>
> Background
>
> On April 13, 2005 at 7 am, Mr. Demos was assigned Truck 225 with the Laborers. The Laborers were picking new assignments that morning and Mr. Demos parked Truck 225 on Lake Street. At approximately 0715 hours he left the truck, got into his personal vehicle and left the West Shops area. Mr. Demos was arrested for soliciting at approximately 0735 by an undercover police officer and taken into custody, with his auto being impounded. Mr. Demos left his CTA truck abandoned on Lake Street without any follow-up call to the shops about its whereabouts.
>
> At approximately 1830 hours on April 13, 2005, Mr. Demos called Manager D. Murphy at his home and stated that after reporting for work he was not feeling well and left in his own vehicle to go to his home in Justice, Illinois because he thought he was having a heart attack. No mention was made of the arrest or any subsequent actions. He also told Murphy that he was going to be off on Thursday April 13, 2005 because of his illness.
>
> On Friday, April 15, 2005, Mr. Demos was interviewed by T. Carduff regarding the abandoned truck incident of Wednesday, April 13, 2005. Mr. Demos again related the story of feeling ill and attempting to go home because he thought he was having a heart attack. Again, Mr. Demos made no mention of being arrested.
>
> Mr. Demos was then issued a Final Written Warning for abuse of company time and leaving an assigned work location.
>
> Following receipt of additional information regarding Mr. Demos' activities, he was told to report to the West Shops and Mr. Murphy's office at 1000 hours on Monday, April 18, 2005 and to secure Union representation for that meeting.

## Interview Summary

At the April 18, 2005 interview, Mr. Demos was given a copy of a notice of administrative rights and was asked to sign the document as evidence of his awareness of those rights. He signed the document after some discussion.

Mr. Demos again stated that on Wednesday, April 13, 2005, he was feeling ill and decided to go in his personal auto to home. When asked about the need for paramedics if he felt he was having a heart attack, Mr. Demos had no response.

Mr. Demos stated that he was enroute to the Stevenson expressway via the Damen Ave. entrance ramp when he hit a bump or something and spilled coffee into his lap. He stopped his car immediately. There a woman approached his car and opened the passenger door, asking whether he wanted a date. Mr. Demos stated he said, "No". However she left his passenger door open and he proceeded to yell at her that she could have closed it. Meanwhile, he closed the passenger side door and turned the corner when he was stopped by the Chicago Police and arrested for Soliciting. According to the police report, some mention of $10.00 was expressed regarding a sex act.

Mr. Demos stated that he made no mention of his arrest because he felt embarrassed and would be teased by his fellow workers. He also did not want his girlfriend to know about the events. He admitted that he deliberately withheld information.

\*\*\*

## Rule Violations

In view of the above, it is apparent that on April 13 and 15, 2005, Mr. Demos made false and misleading oral and written statements to members of management concerning his abandonment of Truck 225. These actions are clearly serious behavior violations.

Mr. Demos' actions were not in keeping with an effective or an efficient operation and were in violation of at least the following CTA rules:

| | |
|---|---|
| 7 (a,b,c) | Obedience to Rules |
| 12 (e) | Responsibility for Property |
| 14 (e,j) | Personal Conduct |
| 17 | Accident Incident Reports |
| 24 | Use of Best Judgment |

In view of the severity of these charges, Mr. Demos committed serious behavioral violations for failing to inform the Authority of the circumstances surrounding his abandonment of Truck 225 and for making false statements when questioned as to events surrounding the incident.

Conclusion and Recommendation

Mr. Demos' actions were not in keeping with an effective or efficient operation and were detrimental to the service. It is therefore recommended that Peter Demos be discharged on April 27, 2005.[1]

Based upon Jendrach's recommendations, CTA General Manager Robert Degnan terminated Demos on April 27, 2005, and in due course the instant grievance was presented. The CTA denied the grievance at each step in the established grievance procedure, and it is upon these essential facts that the matter came to be heard by the Arbitrator, free of procedural defect, for a final and binding determination on its merits.

At arbitration, Demos maintained his innocence of all criminal activity on April 13, 2005, though he admitted again that he had initially lied to CTA management about where he had spent the better part of the day. Demos also insisted that he truly had been ill with heart attack symptoms that morning, and produced a written statement allegedly signed by his doctor, indicating that he had made several attempts to make an appointment the following day.[2]

Undercover Chicago Police Officer Stephanie Gonzalez also testified at arbitration, asserting that at approximately 7:30 a.m. on April 13, 2005, Demos stopped his vehicle near a street corner where she was posing as a prostitute, and made deliberate eye contact with her. According to Gonzalez, she therefore approached the driver's side of Demos' vehicle and asked him if he was looking for a "date". Gonzalez testified unequivocally that Demos responded in the affirmative. Gonzalez did not subsequently testify as to the exact nature of their consequent

---

[1] Joint Exhibit 6.  
[2] At arbitration, CTA counsel objected to the admission of Dr. Coleman's alleged statement into evidence, because Dr. Coleman was not present to testify as to its authenticity. (Tr. 67.)

arrangement, however her arrest report containing a description of it was entered into evidence as Joint Exhibit 11. Union counsel challenged the document only to the extent that "hearsay was involved". (Tr. 20.)

Ironworker Helper and Union Steward Thomas Respondi testified for the Union. Respondi testified as to an occasion when he, himself, had been subject to discharge pursuant to CTA Corrective Action Guidelines for allegedly falsifying payroll documents. According to Respondi, he received a 29-day suspension for his alleged misconduct, which was subsequently reduced, by agreement between the parties, to a 3-day suspension. Respondi also testified that two other employees similarly charged were not terminated, but were assessed 29-day suspensions.

## THE ISSUE

The parties stipulated that the issue to be decided by the Arbitrator is:

Did the CTA have just cause to terminate Mr. Peter Demos on April 27, 2005, and if not, what shall be the remedy?

## RELEVANT CONTRACT AND WORK RULE PROVISIONS

### SECTION 1.5 – NON-INTERFERENCE

The Authority shall be a liberty at all times during the existence of this Agreement and subject to provisions hereof, to operate its property according to its best judgment and the orders of lawful authority. The Union agrees that it will in no way interfere with or limit the right of the Authority to discharge or discipline its employees where sufficient cause can be shown.

### GENERAL RULE BOOK

Rule 12 (e) – Responsibility for Property

(e)  Employees must safeguard the Authority's property

Rule 14 (e,j,w) – Personal Conduct

(e)   Conduct unbecoming an employee

(j)   Falsifying any written or verbal statement

(w)   Abuse of company time; poor work performance

Rule 17(a) – Accident Incident Reports

(a)   ... Employees must not falsify any reports

Rule 18(a) – Reporting for Duty

(a)   Employees must not change their scheduled working hours, assignments or duties unless authorized to do so by the appropriate supervisor. Tardiness or unauthorized early departure is not permitted.

Rule 24 – Use of Best Judgment

Should a situation requiring prompt action arise which is not covered by the rules in the General Rule Book, specialized rule books, executive orders, bulletins or instructions, the employees involved must use their best judgment in selecting the best course of action to follow, then report the action taken to appropriate supervision as soon as possible thereafter.

## CORRECTIVE ACTION GUIDELINES

I.   Behavioral Violations/Corrective Actions

The following violations are subject to immediate discharge:

- Making untrue, dishonest or misleading reports (falsification)

## POSITIONS OF THE PARTIES

**The Position of the Authority:**

At the outset, the CTA argues that Demos made false and misleading statements, a fact wholly substantiated in this record by his own admission. There is no dispute, argues the CTA, that Demos was arrested at 2701 W. Madison on the morning of April 13, 2005, and was subsequently incarcerated for soliciting a prostitute. There is further no dispute, notes the CTA, that Demos told his manager that he had gone home sick that morning, and later admitted that his

statements were untrue. "There could not be a clearer case of an employee providing false and misleading information", argues the CTA. The CTA is not persuaded in Demos' favor by the fact that he eventually told the truth about spending the day in jail, arguing that his belated confession and his stated excuses for lying in the first place, should not absolve him of responsibility for violating the General Rules referenced in his April 27, 2005 notice of termination. In support, the CTA cites <u>CTA and Amalgamated Transit Union, Local 241, Cassanya-Harrison grievance</u>, in which Arbitrator Cox upheld the discharge of a CTA bus operator who was terminated for making false and misleading statements pertaining to a bus accident, even though she ultimately confessed to the truth.

As to the sanction of termination, the CTA argues that it was entirely appropriate given the facts in this case. Not only is there ample arbitral support for termination in instances of proven falsification in other industries, argues the CTA, Demos' termination was entirely consistent with CTA's own Corrective Action Guidelines which expressly provide that an employee found to have made "untrue, dishonest or misleading reports" is subject to immediate discharge.[3]

The CTA also argues that the Union has not established that Demos was treated differently than other employees who engaged in similar misconduct. The CTA rejects the Union's attempt to compare him to Thomas Respondi, who testified that in 1997 he and a number of other drivers were accused of leaving work early on two occasions but were not discharged despite management's recommendations. Demos is not similarly situated to

---

[3] Joint Exhibit 8 at page 7. See also; <u>W. R. Grace & Co. and United Steelworkers of America, Local 863</u>, 89 LA 999, 1003 (Galambos, 1986), citing <u>Kroger Co. and International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local 249</u>, 44 LA 915, 917 (Cahn, 1965).