Respondi and the others, argues the CTA; they were disciplined by a different manager, during a different time frame, and for entirely different rules violations.

In sum, the CTA argues that, "The Corrective Action Guidelines, General Rule Book and applicable arbitration opinions clearly state that falsification is an immediate dischargeable offense. By his own admission, Demos provided conflicting reports to CTA management concerning a serious incident. CTA was well within its rights to discharge Demos." For those and all the foregoing reasons, then, the CTA urges the Arbitrator to deny the instant grievance in its entirety.

**The Position of the Union**

The Union argues that the CTA did not have just cause to terminate Demos, because it failed to consider both his length of service and his lack of prior discipline as mitigating factors meriting progressive discipline. There is no evidence, argues the Union, that CTA General Manager Robert Degnan considered Demos' 10 years of discipline-free service before discharging him. Moreover, argues the Union, "[The CTA] has not followed its past practice of following progressive discipline as applied to other employees." In support, the Union notes that 14-year employee Tom Respondi had previously been charged with falsifying time records, and had been assessed a 29-day suspension which was ultimately reduced to a 3-day suspension. Moreover, notes the Union, two other employees charged with similar offenses were "automatically given 29 day suspensions and returned back to work." Termination, maintains the Union, was not even considered by the CTA in those cases. On this point, then, the Union argues that the CTA responded more severely to Demos than it did to other employees "whose conduct was more egregious...".

The Union notes that Demos admitted giving a false statement to his supervisors regarding his whereabouts on April 13, 2005. "His conduct, while inappropriate", notes the Union, "did not rise to the same level of conduct as that of Mr. Respondi [and other similarly situated employees]... clearly their conduct was deliberate." Unlike those employees, maintains the Union, Demos made his statements "out of fear that his fiancée and colleagues would find out about his arrest..." Demos, argues the Union, admitted being "AWOL" for the entire day of April 13th, and moreover acknowledged leaving his truck unattended. Yet, notes the Union, management was prepared to issue him a mere letter of warning until he fully disclosed the circumstances of his arrest and detention. Thus, reasons the Union, "[The] conduct for which he was terminated was not being AWOL or abandoning a vehicle, but the act of not fully disclosing his whereabouts." Clearly, insists the Union accordingly, the CTA was much more lenient with Mr. Respondi and the others than with Demos.

In sum, the Union argues that the CTA has not met its burden to prove that Demos' termination was justified. "As an employee with ten years seniority and no history of discipline, argues the Union, "Mr. Demos was entitled to receive a lesser form of discipline consistent with the Employer's internal disciplinary guidelines and past practice..." For all the foregoing reasons, then, the Union urges the Arbitrator to sustain the grievance in its entirety and grant the relief requested.

## DISCUSSION AND ANALYSIS

After scrutinizing this record and the arguments of the parties, the Arbitrator is persuaded that the Authority was justified in terminating Demos' employment. There is no real question that on the morning of April 13, 2005, Demos abandoned his post and his CTA vehicle, and was subsequently arrested and charged with soliciting a prostitute while he was still on duty and on

the clock. It is also clear that Demos lied to CTA officials about the circumstances of his

unauthorized absence on that date, and continued to do so until his arrest became a matter of

public record and thus came to management's attention. However, and this is slightly though not

fatally problematic, there is also unchallenged evidence that before Demos' fabrication became

known to management, the CTA issued him a mere letter of warning (consistent with the fact

that he had incurred no prior discipline) rather than a substantive sentence for serious

misconduct.

While it is true that the CTA charged Demos with violating General Rule 7 (Obedience to

Rules), General Rule 12 (Responsibility for Property), and General Rule 24 (Use of Best

Judgment) in its discharge recommendation, testimony and evidence presented at arbitration

clearly establishes that management overwhelmingly relied on his alleged violation of Sections

(e) and (j) of General Rule 14 (Personal Conduct) and Section (a) of General Rule 17 (Accident

Incident Reports) as a basis for terminating his employment. It is a known fact that Demos

abandoned his CTA vehicle on Lake Street for an entire day, and thus "failed to safeguard the

Authority's property" (Rule 12 e). Moreover, the record leaves little doubt that Demos failed to

"obey rules", and most certainly failed to exercise "best judgment". For all of those infractions,

however, management was prepared to sanction him with a letter of warning; that is, until

additional information came to light proving that Demos had lied about why he had abandoned

his post and failed to safeguard CTA property. Thus, the Arbitrator concludes that the real heart

of the matter in this case, is not whether Demos' going AWOL on April 13th constituted even

partial grounds for his termination. Clearly, it did not. Instead, the Arbitrator concludes that the

issue to be decided is whether or not Demos was unreasonably sanctioned for lying about the

reason for his disappearance, and further whether management responded inappropriately to the nature of the incident prompting Demos' unauthorized absence and subsequent arrest.

As to the first question, the Arbitrator duly considered two primary factors in the context of the CTA's April 18, 2005 Recommendation for Discharge; Demos' essential credibility as a witness in light of record proofs, and the Union's proposed evidence of disparate treatment. First, the CTA has persuasively argued that the Union cannot, and in fact does not, dispute that Demos provided conflicting verbal and written statements to management. There is unchallenged record evidence that on the morning of April 13, 2005, he was arrested at 2701 W. Madison Street for soliciting a prostitute, yet he told his manager later that evening that he had gone home because he thought he was having a heart attack. Two days later, Demos filed a written "Unusual Occurrence Report" similarly contending as follows:

> Was at my car getting wallet when I started to feel sick tight chest pain, sweating. I thought I was having a heart attack – I panicked and left [West Shop].[4]

While Demos later admitted that he initially lied about his real whereabouts on April 13, 2005 (i.e. that he had spent the entire day in jail for soliciting a prostitute) for fear of suffering embarrassment, he steadfastly claimed that he had, in fact, left work that morning due to illness. Demos also consistently maintained his innocence of any criminal wrongdoing on that date.

To the end, Demos contended that after punching in at West Shops, he went to his vehicle to retrieve his wallet, and began experiencing symptoms of a heart attack. Somewhat incredibly, testified Demos, he decided to drive home to Justice (some 45 minutes away) and get his "cholesterol pills" even though he felt "weird", "shaky", and "scared". (Tr. 54.) Demos also persevered in alleging that enroute to the freeway, he accidentally spilled coffee on his leg, and

---

[4] Joint Exhibit 2.

was stopped at the side of the road when he was solicited for sex by someone whom he assumed

was a prostitute. Demos faithfully maintained that he summarily rejected the individual's offer,

yet he acknowledged at arbitration (with no apparent surprise or outrage), that he was

nevertheless arrested and booked into jail by undercover police officers.    Whether or not

Demos' story is actually true, urges the Union, is immaterial, because, "When the CTA charged

him, there was absolutely no reference to this incident or the underlying events of that

incident...:" (Tr. 9.)   However, the record before the Arbitrator is clear; Demos was charged with

falsifying his verbal and written accounts of April 13, 2005, and he was <u>also</u> charged with

conduct unbecoming an employee.   The truth of his alleged illness and subsequent arrest for

solicitation are thus entirely relevant to the Arbitrator's analysis of whether or not the CTA had

just cause to terminate his 10-year employment.

It is axiomatic that, "It is within the province of the arbitrator to determine the weight,

relevance, and authenticity of evidence."[5]  Moreover, according to *Elkouri*:

> "The general approach of arbitrators in giving weight and credibility to
> evidence is effectively illustrated by a statement made by an arbitrator in
> reviewing the discharge of an employee. He noted that the case was illustrative of
> the type of situation in which the facts are to a large extent determined by the
> weight and credibility accorded to the testimony of the witnesses and to the
> documentary evidence offered by the parties."[6]

Likewise, this Arbitrator concludes that his judgment as to whether or not the CTA had

just cause to terminate Demos for violating General Rules 12 and 17, must be reached in context

of the weight and credibility of <u>all</u> testimony and documentary evidence.   In this particular case,

Demos' testimony indeed stretches credulity, and moreover, the "documentary evidence" he

---

[5] How Arbitration Works, Sixth Edition; (2003),Elkouri and Elkouri, page 413.
[6] Id at page 414.

produced at arbitration in support of his assertion that he repeatedly attempted to see his doctor on April 14, 2005, is suspect.

Up to and during the arbitration hearing, Demos steadfastly denied soliciting a prostitute on April 13, 2005. However, record evidence convinces the Arbitrator to the contrary. Undercover Police Officer Stephanie Gonzalez testified that on that date, Demos made deliberate eye contact with her as he stopped his car (ostensibly to deal with his spilled coffee), and subsequently accepted her offer for sex in exchange for money. She was unequivocal in her testimony, and the Union, in the opinion of the Arbitrator, failed to impeach her as a credible witness. Moreover, the Arbitrator credits Gonzalez's testimony over that of Demos, primarily because Gonzalez had no apparent motive to be untruthful. In fact, in the opinion of the Arbitrator, Gonzalez had everything (her career) to lose by lying, while Demos had everything (re-employment) to gain. Rather than attempting to impeach Gonzalez, then, the Union instead attempted to understate the significance of Demos' arrest by contending that the resulting criminal charge of solicitation was ultimately "dismissed". In the end, even this proved to be untrue. Testimony at arbitration established that the charge of solicitation was <u>deferred</u>, and thus "could theoretically be reinstated at a later date." (Tr. 13.)

Then, of course, there is the matter of Demos' alleged illness. Demos testified that on the morning of April 13, 2005, he "felt real funny, like real hot and sweating and tightness" (Tr. 54), yet, according to this record, he failed to seek immediate medical attention, and told no one, including management or even Officer Gonzalez, of his alleged symptoms. Demos testified that though he feared he was having a heart attack, he decided to take his coffee, get into his car, and drive some 45 minutes to his home for "cholesterol pills". Demos also testified that "this had happened quite a few times" already, yet there is absolutely no evidence before the Arbitrator

that he was ever evaluated by a doctor either before <u>or after</u> April 13, 2004. Demos did testify

that he "tried to get in to a doctor because [he] was worried about his chest" (Tr. 65), but

maintained that his doctor was "too busy" to see him. This assertion, too, strains credulity. The

Arbitrator finds it highly improbable that any doctor would have urged Demos to ignore his life-

threatening symptoms simply because of a full schedule at the office. Indeed, even if Demos'

doctor really had been "too busy" to fit him in, the Arbitrator is confident that he would either

have urged Demos to seek immediate emergency medical care, or at the very least prompted him

to seek out another doctor.

At arbitration, Demos did produce an alleged "affidavit" dated October 13, 2005 from

Mark Coleman, M.D., stating as follows:

> To Whom It May Concern,
>
> As my records show, Mr. Demos called our office on April 14, 2004 numerous
> times for an appointment. Due to a booked schedule, my office was unable to
> give him an appointment.
>
> If you have any questions please contact my office.[7]

CTA counsel objected to the introduction of the above document, on the basis that Dr.

Coleman was not present at arbitration to authenticate it. (Tr. 67.) The Arbitrator, as is his

customary practice, nevertheless accepted it "for what it was worth" (Tr. 68), and upon later

scrutiny, found it to be suspect at the very least, if not entirely false. Dr. Coleman's alleged

statement was printed under nonprofessional letterhead, which in and of itself is really neither

here nor there. However, the address of the doctor's office as printed in the letterhead, contained

a typographical error. The City of Lagrange, Illinois was misspelled as "Lagrane, IL.". While

he makes no definitive factual finding that Dr. Coleman's office could not possibly have made

---

[7] Union Exhibit 2.

(or missed) such an error in its letterhead, the Arbitrator certainly finds it *unusual*, after having examined literally hundreds, perhaps thousands, of similar doctors' statements in his nearly half century exposure to them as a labor advocate, management advocate, and nearly a quarter century as an arbitrator.   Accordingly, as he is privileged to do, the Arbitrator finds the Union's "documentary evidence" of Demos' alleged attempts to visit his doctor of little or no value based upon its questionable veracity and a further lack of record evidence that he, <u>even to this day</u>, has ever been evaluated by Dr. Coleman or anyone else for a potentially life-threatening heart condition.

As to the matter of alleged disparate treatment, the Arbitrator duly considered the Union's evidence that other bargaining unit employees accused of falsifying reports were not summarily terminated as was Demos.   Under other circumstances, the Arbitrator might have been persuaded to consider the CTA's treatment of Demos unduly harsh and inconsistent with past practice.   However, Demos' discharge was entirely in keeping with CTA's Corrective Action Guidelines which expressly state that employees "making untrue, dishonest or misleading reports" are subject to immediate discharge.   Moreover, the employees cited by the Union in support of its assertion of disparate treatment, were charged with an entirely different type offense (falsifying payroll documents).   Indeed, as the CTA maintained, in order for an affirmative argument of disparate treatment to prevail, the Union must demonstrate that employees involved in similar or identical misconduct have been dealt with differently.   While "falsification" was indeed involved in the other scenarios presented by the Union at this arbitration, the Arbitrator finds the actual circumstances of Demos' infractions to be substantively different.   Furthermore, any leniency the CTA may have shown to Respondi and the other employees involved in the alleged payroll record falsification, is beyond the scope of

the Arbitrator. CTA Corrective Action Guidelines expressly state that employees making false and misleading written or verbal statements to management are subject to immediate discharge. Thus, CTA's action with regard to Demos was neither arbitrary nor capricious in light of his proven verbal <u>and</u> written dishonesty.

Thus, the only question remaining is whether or not the CTA may have responded inappropriately to the <u>nature and extent</u> of Demos' misconduct by summarily discharging him. In other words, had Demos gone to Wrigley Field and lied about it instead of soliciting a prostitute (and getting arrested) and lying about it, would the CTA still have had grounds to discharge him?   Pursuant to CTA Corrective Action Guidelines, the Arbitrator is persuaded in the affirmative, though perhaps management would have found some lesser penalty (in light of Respondi et. al.) more fitting.   Indeed, it is true that the CTA's case in chief centered on Demos' false statements and his lack of credibility with respect to his alleged illness, and the Union obviously banked on this fact when it promulgated its disparate treatment argument.  However, the record clearly establishes that Demos was <u>also</u> charged with "conduct unbecoming an employee".  While exactly what constitutes "unbecoming conduct" in any given situation is inherently subjective and a matter of context, the Arbitrator is certainly convinced that soliciting a prostitute <u>while on duty</u> qualifies as such under any circumstances.   There is absolutely no question that even though Demos was not on CTA property or operating a CTA vehicle at the time of his arrest, he was still on the clock.  In fact, Demos himself testified that he opted not to inform his supervisor of his alleged illness because he "was just going to run home and get [his] pills and come right back." (Tr. 55.)  Thus, even Demos acknowledged that he was still on duty and on the clock when he departed West Shops in his personal vehicle, and had he returned