### STATE OF ILLINOIS
### ILLINOIS LABOR RELATIONS BOARD
### LOCAL PANEL

CTA Trade Coalition,                          )
                                              )
              Charging Party    )
                                              )
and                                           )          Case No. L-CA-05-039
                                              )
Chicago Transit Authority,                    )
                                              )
           Respondent ·      )

### ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION AND ORDER

On February 24, 2005, the CTA Trade Coalition (Charging Party or Coalition),
filed a charge with the State Panel of the Illinois Labor Relations Board, (Board) pursuant
to the Illinois Public Labor Relations Act, 5 ILCS 315 (2004) (Act), *as amended*, and the
Rules and Regulations of the Illinois Labor Relations Board, 80 Ill. Adm. Code, Sections
1200 through 1230 (Rules) alleging that the Chicago Transit Authority (Respondent or
CTA) had violated Section 10(a)(4) and (1) of the Act.  The charges were investigated in
accordance with Section 11 of the Act and, on ████████ ██ ████ the Executive Director of
the Board issued a Complaint for Hearing.

A hearing was held on February 7, 2006, in Chicago, Illinois, at which time all
parties appeared and were given a full opportunity to participate, present evidence,
examine witnesses, argue orally and file written briefs.  After full consideration of the
parties' stipulations, evidence, arguments and briefs, and upon the entire record of the
case, I recommend the following.

**EXHIBIT**

**B**

I.    **PRELIMINARY FINDINGS**

The parties stipulate, and I find as follows:

1.    At all times material, the Respondent has been a public employer within the meaning of Section 3(o) of the Act.

2.    At all times material, the Respondent has been subject to the Act pursuant to Section 5(b) and Section 20(b) of the Act.

3.    At all times material, the Charging Party has been a coalition of collective bargaining representatives for separate historic bargaining units of trades employees of Respondent (units) and is itself a labor organization within the meaning of Section 3(i) of the Act.

II.    **CONTENTIONS OF THE PARTIES**

For years, the CTA had different written correctional guidelines for different groups of its employees. On March 1, 2005, the CTA, unilaterally and without bargaining, initiated a single correctional guidelines for its employees including those represented by Coalition unions and a new, separate vehicle safety guidelines.

The Coalition contends that these new guidelines affect employees' terms and conditions of employment and thus concern a mandatory subject of bargaining, that the CTA's refusal to bargain prior to implementation of the guidelines violates Section 10(a) (4) and (1) of the Act and that the Coalition did not waive its right to bargain over changes to the guidelines.

The CTA insists that it has inherent managerial authority to set disciplinary guidelines to enforce its standards of service. Alternatively, the CTA argues that its refusal to negotiate guidelines is not an unfair labor practice because every agreement with

Coalition members contains a non-interference clause which states that the union will in no way interfere with or limit the right of the authority to discharge or discipline its employees where sufficient cause can be shown. The CTA considers that a waiver of any right to bargain.

The CTA also contends that unions have otherwise waived any right to bargain, noting that unions can grieve and arbitrate disciplinary matters. Prior to the instant case, no union has ever negotiated, grieved, or questioned the then-existing guidelines. By failing to challenge the then-existing guidelines, the CTA urges, the Coalition waived any right to bargain the CTA's new guidelines. Finally, the CTA argues that it would be extremely burdensome and cumbersome if it had to negotiate guidelines with each of the unions that represent CTA employees.

## III.    FINDINGS OF FACT

Approximately 10,000 CTA employees are represented by unions. The CTA bargains with 16 unions, 15 of which are members of the Coalition. It also bargains with a 17th union, Local 1 of the Ironworkers Union as part of an employer's association. Besides the Coalition, the CTA bargains with the Amalgamated Transit Union (ATU); Local 241 representing 6,800 members; the ATU Local 308 representing 2400 rail employees; the Teamsters Local 726; the International Association of Machinists; Local 701, the Mechanics Union; and IBEW Local 134, in a unit other than the Coalition unit.

Members of the Coalition, representing about 1,100 employees, include International Brotherhood of Electrical Workers Union (IBEW), Local 134; Upholstery and Allied Industries Division of the United Steelworkers of America, Local Union #9777; IBEW Local #9; Chicago, Journeyman Plumbers Local Union #130; Sheetmetal

3

Workers International Association Local Union #115; International Association of Machinists and Aerospace Workers District #8; Metal Polishers, Sign Pictorial & Display, Automotive Equipment Painters, Production & Novelty Workers Local Union #8A-28A; Pipefitters' Association Local Union #597; International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers Local Lodge #1247; Chicago and Northeast Illinois District Council, United Brotherhood of Carpenters and Joiners of America; and United Order of American Bricklayers and Stone Masons, Local Union #21.

The most recent agreements between the CTA and members of the Coalition were effective January 1, 2000 to December 31, 2003. Under those agreements, employees subject to progressive discipline have certain rights. Negotiations for a new agreement between the parities began around the end of 2003.

CTA Guidelines

The CTA has a General Rule Book establishing a code of conduct that all CTA employees are expected to follow. The current version of the Rule Book has been in use since October 1989. The CTA did not negotiate the current Rule Book with any unions and did not negotiate prior versions of the Rule Book. No union has ever grieved implementation of the Rule Book or sought changes in its content.

The CTA first implemented guidelines for its Rule Book in 1978. The guidelines were called "Superintendent's Procedures."[1]  The guidelines were used to educate supervisors on how to discipline employees. The guidelines addressed such topics as the procedures for correcting employees, issuing verbal and written warnings, interviewing employees, handling employees who are unfit for duty. The CTA did not negotiate the

---

[1] A 1983 version of the guidelines was entitled "Handbook for Corrective Action."

guidelines with any unions and, after their implementation, no union grieved their implementation.

At the time the guidelines were introduced, the Amalgamated Transit Union (ATU) took the position that it did not want to negotiate guidelines. The ATU believed its position in arbitration would be weakened because the CTA could argue that the guidelines were reasonable because the CTA and the ATU had negotiated them.

After the Coalition came into existence, the CTA issued revised guidelines effective January 1, 1995.[2] The guidelines applied to all transportation department employees including units represented by the CTA Coalition that had members who worked in the shops. There were different guidelines for different groups of employees. The CTA issued corrective action guidelines for its Construction, Engineering and Maintenance Division, effective August 1, 1997, and for its Materials and Information Management Group and Revenue Equipment Technology and Maintenance Department, effective May 1, 1998. It did not negotiate any of those guidelines with the unions representing the affected employees and those unions did not file grievances or unfair labor practices regarding any changes in the guidelines.

In 2004, the CTA decided to implement the same guidelines for all unionized employees. One reason was to ensure uniformity and consistency. The CTA had had between 8 and 12 separate guidelines for its various departments: service, delivery, security services, revenue equipment and technology, communications, facilities maintenance, and the law department. Additionally, its law department wanted a system of accident determination that would decrease the CTA's exposure to liability for

---

[2] The Coalition and the CTA have negotiated three agreements.

5

accidents. For that reason, the CTA decided to also issue and apply new and separate vehicle accident guidelines for all its employees.

Another factor leading to the decision to have guidelines applicable to all employees was the CTA's new practice of rotating managers among its various departments. Previously, a manager might stay in one department. To make the disciplinary process uniform and understandable for its managers, the CTA decided to put all unionized employees under one set of guidelines.

In a letter dated August 25, 2004, Robert Gierut, CTA's Vice President of Employee Relations, informed members of the CTA Coalition that the CTA would be implementing corrective action guidelines and vehicle accident guidelines on September 1, 2004. Copies of those guidelines were attached to the letter. In the letter, Gierut invited the union representatives to contact him if they had any questions. Several unions did so and asked for an opportunity to discuss the content and application of the guidelines. For that reason, the CTA delayed implementation of the guidelines and scheduled a meeting that was held on September 23, 2004 at the IBEW Local 9's apprentice school.

Representing members of the Coalition at the September 23, 2004 meeting were Laura Foster, John Glatz,[4] Jim Kasmer,[5] John Burkhard,[6] and Mike Fedanzo,[7] Robert

---

[3] Gierut has worked for the CTA for 28 years, rising through the ranks from the position of special assistant to the chairman of the CTA board in 1977 to labor relations representative in 1979, supervisor of personnel for facilities maintenance in 1983, superintendent of facilities and vehicle maintenance in 1985, director of maintenance labor affairs in 1990, and general manager of human resource program compliance in 1995. He has been in his current position since January 2000.

Gierut has a staff of 15 employees who are responsible for negotiating and administering 17 collective bargaining agreements covering 10,000 unionized employees. His other responsibilities include the grievance procedure, discipline, unemployment compensation, drug and alcohol testing, and training and consultation regarding those matters.

Gierut has been involved in collective bargaining since 1979. He has participated in writing revisions of the guidelines.

[4] Foster and Glatz represent the Painters' Union #8A-28A.

[5] Kasmer has been the assistant to the president for industrial operations of the Chicago Regional Council of Carpenters since 1997.

Gierut represented the CTA. Going into the meeting, Coalition members believed that if they explained their concerns about the unilateral changes that would open the door for negotiations regarding the guidelines. However, there were no negotiations at that meeting.

The meeting started with a Coalition request that the CTA negotiate changes in the guidelines. Gierut made it clear that the CTA was meeting for discussion of the guidelines and not to negotiate. Coalition members provided examples of the impact of the new guidelines regarding, absenteeism, tardiness and absences without leave. The Coalition noted differences between situations involving tradesmen and situations involving other CTA employees. Gierut responded that the guidelines were written to deal with the 3 to 5 percent of employees who were bad or poor employees and accounted for 80 percent of all discipline. The union representatives responded that they did not like the CTA's removing a step from the process, a change that could put their members at risk of losing a day or days' pay earlier in the process. Gierut said that historically the CTA had never negotiated changes in the corrective action guidelines. However, Gierut reviewed the entire guidelines with Coalition members and explained changes. At the end of the meeting, the Coalition was still hopeful that there would be dialogue and consideration of negotiations. The CTA's only response was that it would implement the guidelines at a later date. However, it was not clear to the Coalition that the CTA would in fact implement the changed guidelines. The Coalition did not at that meeting or thereafter

---

[6] Burkhard has been the business representative for the International Brotherhood of Electrical Workers, Local 9 since 1997.
[7] Fedanzo represents IBEW Local 134.

submit a proposal regarding the new guidelines because it merely wanted the previous guidelines to remain in effect.

In a letter to Gierut dated October 22, 2004, the Coalition stated that the new guidelines primarily applied to ATU bargaining units but not to Coalition employees. It requested separate guidelines for its own members and asked that it have an opportunity to review any new guidelines before implementation. Gierut responded in a letter dated November 18, 2005, stating that the CTA's guidelines would apply to all bargaining unit employees.

The Guidelines

For the Coalition, one of the most significant changes in the corrective action guidelines was the elimination of a step in many of the different categories for corrective action. Previously, the first step was a written warning, the second step was a final written warning, the third step was a one-day suspension, then a corrective action interview, and finally a recommendation for discharge. The CTA eliminated the final written warning and thus proceeded from a written warning to a one day suspension at the second step instead of the third step.

The Coalition complains about a change regarding injuries as the CTA eliminated the injury-on-duty category and combined it with a safety category to create a new and different category. Any time someone is injured, however slightly, the CTA interprets it as a safety violation.

Under the new guidelines, an employee is subject to discipline regardless of fault. A change was that categories that were separate under previous guidelines such as tardiness and illness are presently lumped together in one category accelerating

8

disciplinary procedures. Under the previous guidelines, the CTA had deemed a 3 to 5 percent absenteeism rate acceptable based on 20 workdays per month and 12 months per year. Under the revised guidelines, only a 3 percent rate was acceptable.[8] Under the previous guidelines, employees were allowed a 2.9 percent absenteeism rate before a one-day suspension which amounted to 7 occurrences. Under the new guidelines, the CTA reduced the absenteeism rate to 1.6 percent which amounted to 4 occurrences.[9]

In previous guidelines regarding attendance, the CTA treated employees in the trades differently from bus drivers and train operators. Initially, the guidelines addressed employees who operated buses and trains. The functions of Coalition employees are not as time sensitive as they do not directly deal with the public.

Kasmer, the Carpenter's Union representative, explained the practical impact of the new guidelines. Kasmer represents employees in disciplinary interviews. An employee who was in the bus heavy maintenance division was initially disciplined under the new guidelines for two incidents of tardiness and an early departure over a 12 month period and received a written warning. After he had two more incidents, the employee was suspended for one day. Under the old guidelines the employee would have been allowed one more incident before the suspension.

The February 23, 2005 Meeting

On February 22, 2005, the Coalition received a letter announcing implementation of new guidelines on March 1, 2005. At a collective bargaining negotiation session the next day on February 23, 2005, the Coalition again brought up the subject of the

---

[8] According to Gierut, safety and absenteeism are cost factors for the CTA in terms of claims for damages and lost time especially in light of the CTA's ongoing financial crisis.
[9] Burkhard testified that the changes in the guidelines would lead to faster discharge of employees. Burkhard represents IBEW Local 9 union members in serious discipline cases with the CTA. He is involved

9

guidelines.[10]  Present for the Coalition was ~~Margaret Angelucci,~~ John Burkhard, Robert Pierson, Laura Foster, John Glatz and several other Coalition representatives.  Present for the CTA were Daley, Stevens, Donovan, Gierut and Maloney.  During a caucus with the Coalition, Angelucci learned that the day before members of the Coalition had each received a letter from Gierut announcing implementation of the guidelines on March 1, 2005.[11]  ~~When she returned~~ to the negotiation session, ~~Angelucci stated that the guidelines were a mandatory subject of bargaining~~ and that the ~~parties needed to bargain the matter~~.  The Coalition did not make a proposal regarding the guidelines because it wanted to keep in effect the previous guidelines.  Daley responded that the past practice was that guidelines were composed without input from the unions and the CTA was not about to start bargaining them.  According to Daley, the CTA only gave notice to the Coalition of changes in guidelines.

The ~~guidelines were implemented in March 2005~~.  The CTA did not amend the guidelines to reflect the Coalition's concerns and has never indicated a willingness to bargain guidelines.  Gierut, whose office is involved in discipline and discharge cases, has not noticed any increase in discipline since implementation of the guidelines.  He believes that negotiating guidelines would be a burden because the CTA has 17 bargaining units

---

annually in about a dozen such cases.  About half of them involve performance violations, absenteeism and safety issues.
[10] The ~~primary spokesman~~ for the Coalition in collective bargaining negotiations is ~~currently~~ Margaret Angelucci is the secondary spokesperson.  The primary or secondary spokesperson has authority to make, alter, amend, accept or reject proposals.  Representatives of individual unions within the Coalition include Bob Pierson and John Burkard from Local 9; Jim Kasmer from the Chicago Regional Council of Carpenters; Mike Fedanzo from Local 134, IBEW, John Agrella from Local 73, Sheet Metal Workers Local Union #115; Laura Foster and John Glatz from the Painters' Union #8A-28A, McManus from the Plumbers Local Union #130; Fabian from the Boilermakers' Lodge #1247, Thompson from the Bricklayers' Local #21; Harrison Mailey from the Upholstery Local Union #9777; and Carl Gallman from the International Association of Machinists and Aerospace Workers District 8.
The primary spokesman for the CTA is James Daley, with Joe Stevens as a secondary spokesman.  Other members of the CTA negotiating team were, Bob Gierut, Stephanie Donovan and Mark Maloney.

and negotiations could result in 17 different guidelines. In Gierut's opinion, that would make discipline a convoluted and burdensome process that would not be uniform and would confuse managers. However, there is no evidence in the record as to how prior differing guidelines confused managers or resulted in a burdensome process. There is also no record evidence as to why managers, upon rotation, could not be instructed on different guidelines.

The Agreement

The non-interference clause in the CTA's agreements with Coalition members provides in pertinent part as follows:

> The Union agrees that it will in no way interfere with or limit the right of the Authority to discharge or discipline its employees where sufficient cause can be shown. . . .
> It is expressly agreed that all rights and powers of management are retained by, reserved to and exclusively vested in the Authority, including but not limited to the right to plan, direct, curtail, determine and control the employer's operations, hire, suspend, discipline or discharge for proper cause, layoff, transfer, to promote efficiency, to contract or subcontract and all rights customarily exercised by an employer, except as may be specifically limited by this Agreement, are vested in the Authority.

## IV. DISCUSSION AND ANALYSIS

The issue in this case is whether the CTA refused to bargain in violation of Section 10(a)(4) and (1) of the Act when it refused to negotiate with the Coalition regarding the changes it made in its guidelines issued March 1, 2005.[12] Section 7 of the Act requires parties to bargain collectively regarding the employees' wages, hours and other conditions

---

[11] Angelucci was aware that implementation of the guidelines had been delayed and she had received a copy of guidelines dated August 2004.

[12] Section 10(a)(4) of the Act provides that it shall be an unfair labor practice for an employer or its agents: to refuse to bargain collectively in good faith with a labor organization which is the exclusive representative of public employees in an appropriate unit, including, but not limited to, the discussing of grievances with the exclusive representative.

of employment – the mandatory subjects of bargaining.[13] *American Federation of State, County and Municipal Employees v. Illinois State Labor Relations Board*, 190 Ill. App. 3d 259, 546 N.E. 2d 687, 6 PERI ¶4004 (1989); *Illinois Department of Central Management Services*, 17 PERI ¶2046 (IL LRB-SP 2001).  There is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮in with the Charging Party prior to implementing its revised guidelines in March 2005.

Under ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, IEA/NEA v. Illinois Educational Labor Relations Board, 149 Ill. 2d 496, 599 N.E. 2d 892 (1992), and *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 692 N.E. 2d 295, 14 PERI ¶4005 (1998), a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ wages, hours and work conditions ▮▮▮▮▮▮▮▮▮t and 1) is either not a matter of ▮▮▮▮▮▮▮▮▮▮▮▮▮ or is a matter of inherent managerial authority for the Board determines that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ burden bargaining imposes on the employer's authority. *Illinois Department of Central Management Services*, 17 PERI ¶2046.

---

[13] Section 7 provides in pertinent part as follows:

A public employer and the exclusive representative have the authority and the duty to bargain collectively set forth in this Section.

For the purposes of this Act, "to bargain collectively" means the performance of the mutual obligation of the public employer or his designated representative and the representative of the public employees to meet at reasonable times, including meetings in advance of the budget-making process, and to negotiate in good faith with respect to wages, hours, and other conditions of employment, not excluded by Section 4 of this Act, or the negotiation of an agreement, or any question arising thereunder and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession.

The Respondent's ▨▨▨▨ ▨▨▨▨▨ guidelines ▨▨▨ ▨▨▨ ▨▨▨▨▨▨▨ of the *Central City/Belvidere* analysis because it ▨▨▨▨ ▨▨▨ ▨▨▨▨▨▨▨▨▨▨ ▨▨▨ ▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨ of the bargaining unit. The Respondent's elimination of a ▨▨▨ step in the disciplinary process means that an employee would be su▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨ ▨▨ ▨▨▨ ▨▨▨▨▨▨, ▨▨▨▨▨▨ ▨▨ ▨▨▨ ▨▨▨▨ step in the process. The elimination of the injury on duty category and its combination with a safety category means that the CTA would more severely discipline an employee or discharge an employee sooner.

Further, the Respondent's cha▨▨▨▨ in the guidelines does n▨▨ ▨▨▨▨▨▨▨ ▨ ▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨ authority. See Ha▨▨▨▨ ▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨ ▨▨▨ ▨▨▨▨▨▨ ▨▨ ▨▨ ▨▨▨▨▨▨ (▨▨▨▨▨ rules affecting an employee's continuation of employment will be a mandatory subject of bargaining regardless of the employer's legitimate reason for its promulgation).

I▨▨▨▨▨▨ ▨▨▨ ▨▨▨▨ ▨▨▨▨▨▨ the Respondent's changes in the guidelines had been a ▨▨▨▨▨▨ ▨▨ ▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨ requiring a balancing of the benefits and burdens of bargaining, I would still ▨▨▨▨▨▨▨▨ ▨▨▨ ▨▨▨▨▨ ▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨ ▨ ▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨ ▨▨ ▨▨▨▨▨▨▨▨▨. The Coalition's membership would clearly benefit from bargaining because their functions are not as time-sensitive as those of employees directly providing scheduled transportation services to the public. Thus, the Coalition could argue, for example, that penalties for absenteeism and tardiness for its members should not be as severe as for employees who operate buses and trains. The Coalition by its specific knowledge of its members may be in a unique position to devise penalties that deter and appropriately punish misconduct. *Cf. Chicago Park District*, 18 PERI ¶3026 (IL LRB-LP 2002) *aff'd Chicago Park District v. Illinois Labor Relations Board and Service Employees International Union, Local 73*, 20 PERI 145 (2004), *cert denied*, Illinois

Supreme Court, October 6, 2004. (employer committed unfair labor practice where it unilaterally reduced employees' hours; union could have proposed ways to address budget cuts that minimized impact on employees).

The Respondent has also failed to establish that requiring it to bargain regarding its guidelines would have imposed a significant burden on its authority. The Respondent recites that it would be easier for its managers if discipline was uniform for all unionized employees. However, I do not deem any inconvenience to the CTAs' managers to outweigh the Coalition members' interest in a disciplinary policy tailored to their peculiar working conditions. Moreover, the CTA operated under differently tailored policies of its own devising throughout its history. Thus, had it been necessary to apply the third part of the *Central City/ Belvidere* analysis, I would have determined that the balance of interests clearly favors bargaining. ████████, therefore, re████ss of whether the Respondent's changes in its guidelines was a matter of inh████ managerial authority, it was ████████atory s███████ ███████ over which the Respondent was required to bargain prior to implementation.

The CTA advances two arguments that the Coalition ██████ any right to bargain changes in the guidelines. First, the CTA contends that the m████████████████ in its agreements with members of the Coalition gr████ ████████ ████ to discipline and discharge its employees for proper cause. The CTA notes that employees have a right to grieve discipline. The CTA's a████████ ████████. The Co████ ████ ████████ the CTA's r████ ████████████ Rather, the C████████ argues ████ ████ ████ must ██████ changes in its disciplinary procedures and that such changes are mandatory subjects of bargaining. It is the ████████ that determine whether the CTA has fulfilled

14

the proper cause requirement to discipline. I conclude that the non-interference clause does not constitute a waiver of the Coalition's right to bargain regarding changes in disciplinary procedures.

Secondly, the CTA argues that the Coalition waived any right to bargain the disciplinary guidelines by its failure to object to previous guidelines that the CTA unilaterally implemented. The CTA reasons that because it has the exclusive right to discipline employees and had a past practice of developing, implementing and revising guidelines without bargaining with the Coalition or the Coalition grieving, the Coalition waived any right to bargain guidelines.

The Board has held that a waiver must be clear and unmistakable. *Village of Bensenville*, 19 PERI 119 (IL LRB-SP 2003); *Chicago Park District*, 18 PERI ¶3036 (IL LRB-LP 2002). The language sustaining the waiver must be specific, as waiver is never assumed. *Chicago Park District*, 18 PERI 3036. In this case, there is no language in the non-interference clause or in the Agreement that specifically states that the Coalition waived its right to bargain changes in disciplinary procedures. Therefore, I reject the CTA's arguments and conclude that the Coalition did not waive its right to bargain over changes in disciplinary guidelines.

I also reject the CTA's argument that the Coalition waived any right to bargain by failing to object to previous changes in the guidelines. In *NLRB v. Miller Brewing Co.*, 408 F. 2d 12, 70 LRRM 2907, 2909 (9th Cir. 1969), the court stated:

> [I]t is not true that a right once waived under the Act is lost forever. [Citation omitted.] Each time the bargainable incident occurs – each time new rules are issued – Union has the election of requesting negotiations or not. An opportunity once rejected does not result in a permanent "close-

out;" as in contract law, an offer once declined but then remade can be
subsequently accepted. [Citation omitted.]

As there is no dispute that the Respondent failed to bargain over the guidelines, I conclude
that the Respondent violated Section 10(a) (4) and (1) of the Act when it refused to
bargain changes in its guidelines.

Accordingly, as is the Board's policy in unfair labor practices cases where the
employer has unilaterally changed the wages, hours or terms and conditions of a
bargaining unit, I recommend that the Board order the Respondent to rescind the status quo
ante and to bargain with the Charging Party in good faith upon request until such time as
the parties reach agreement or a legitimate impasse. *Illinois Department of Central
Management Services*, 17 PERI ¶2046.  Restoration of the status quo includes
compensating affected employees and expunging their disciplinary records.

## V.    CONCLUSIONS OF LAW

The Respondent, in violation of Section 10(a) (4) and (1) of the Act failed to
provide an opportunity to bargain to the Charging Party prior to the Respondent's
changing its corrective action guidelines and vehicle safety guidelines.

## VI.    RECOMMENDED DECISION AND ORDER

IT IS HEREBY ORDERED that the Respondent, the Chicago Transit Authority,
its officers and agents shall

1. Cease and desist from

    (a) Failing and refusing to bargain collectively in good faith with the Charging
    Party, the CTA Trade Coalition, regarding changes in the CTA's corrective
    action guidelines and vehicle safety guidelines.

16

(b) In any like or related manner, interfering with restraining or coercing its employees in the exercise of the rights guaranteed them in the Act.

Take the following affirmative action necessary to effectuate the policies of the Act:

(a) On request, bargain collectively with the CTA Trade Coalition regarding changes in the corrective action guidelines and vehicle safety guidelines.

(b) Restore the status quo ante with respect to the changes to the guidelines until such time as it bargains to agreement or to legitimate impasse with the CTA Trade Coalition.

(c) Make whole members of the unit for lost wages beginning from the date of the changes to the guidelines until the date of restoring the status quo ante with interest as allowed under the Act.

(d) As deemed correct or expunge the disciplinary records of affected employees to reflect the CTA's reliance on previous guidelines in imposing discipline rather than reliance on the guidelines implemented in March 2005.

(e) Preserve and on request make available to the Board or its agents for examination and copying all payroll and other records required to calculate the amount of back pay due under the terms of this order.

(f) Post at all places where notices to employees are normally posted, copies of the Notice attached hereto. Copies of the Notice shall be posted, after being duly signed, in conspicuous places and be maintained for a period of 60 consecutive days. Respondent will take reasonable efforts to ensure that the notices are not altered, defaced or covered by any other material.

17

(g) Notify the Board in writing, within 20 days from the date of this Decision of the steps Respondent has taken to comply herewith.

## VIII. EXCEPTIONS

Pursuant to Section 1200.135 of the Board's Rules, parties may file exceptions to the Administrative Law Judge's Recommended Decision and Order and briefs in support of those exceptions no later than 30 days after service of this Recommended Decision and Order. Parties may file responses to exceptions, and briefs in support of the responses, no later than 15 days after service of the exceptions. In such responses, parties that have not previously filed exceptions may include cross-exceptions to any portion of the Administrative Law Judge's Recommendation. Within 7 days from the filing of cross-exceptions, parties may file cross-responses to the cross exceptions. Exceptions, responses, cross-exceptions and cross-responses must be filed with the Board's General Counsel, Jacalyn J. Zimmerman, 160 North LaSalle Street, Suite S-400, Chicago, Illinois 60601-3103, and served on all other parties. Exceptions, responses, cross-exceptions and cross-responses will not be accepted at the Board's Springfield office. The exceptions and/or cross-exceptions sent to the Board must contain a statement listing the other parties to the case and verifying that the exceptions and/or cross exceptions will not be considered

without this statement.  If no exceptions have been filed within the 30-day period, the parties will be deemed to have waived their exceptions.

**Issued at Chicago, Illinois on this 28th day of June, 2006.**

**STATE OF ILLINOIS**

**ILLINOIS LABOR RELATIONS BOARD LOCAL PANEL**

*Sharon B. Wells*

**Sharon B. Wells**
**Administrative Law Judge**

After a hearing in which all parties had the opportunity to present their evidence, the Illinois Labor Relations Board found that the Chicago Transit Authority has violated the Illinois Public Labor Relations Act, and has ordered us to post this Notice. We hereby notify you that:

The Illinois Public Labor Relations Act (Act) gives you as an employee, these rights:

    To engage in self-organization
    To form join, or assist unions
    To bargain collectively through a representative of your own choosing
    To act together with other employees to bargain collectively or for other mutual aid or protection
    To refrain from these activities

Accordingly, we assure you that:

WE WILL cease and desist from refusing to bargain with the CTA Trade Coalition regarding changes to the corrective action guidelines and vehicle safety guidelines.

WE WILL restore the status quo ante with respect to the corrective action guidelines and vehicle safety guidelines until such time as we have bargained to impasse or to a resolution.

WE WILL make whole employees for any loss of earnings suffered as a result of the unilateral implementation of changes to the corrective action guidelines and vehicle safety guidelines.

WE WILL adjust, correct or expunge the disciplinary records of affected employees to reflect the CTA's reliance on previous guidelines in imposing discipline rather than reliance on the guidelines implemented in March 2005.

DATE _____        _____

                        Chicago Transit Authority


                        _____

                        (Representative)(Title)

# NOTICE TO EMPLOYEES

## FROM THE
## ILLINOIS LABOR RELATIONS BOARD

After a hearing in which all parties had the opportunity to present their evidence, the Illinois Labor Relations Board found that the Chicago Transit Authority has violated the Illinois Public Labor Relations Act, and has ordered us to post this Notice. We hereby notify you that:

The Illinois Public Labor Relations Act (Act) gives you as an employee, these rights:

    To engage in self-organization
    To form join, or assist unions
    To bargain collectively through a representative of your own choosing
To act together with other employees to bargain collectively or for other mutual aid or protection
    To refrain from these activities

Accordingly, we assure you that:

WE WILL cease and desist from refusing to bargain with the CTA Trade Coalition regarding changes to the corrective action guidelines and vehicle safety guidelines.

WE WILL restore the status quo ante, with respect to the corrective action guidelines and vehicle safety guidelines until such time as we have bargained to impasse or to a resolution.

WE WILL make whole employees for any loss of earnings suffered as a result of the unilateral implementation of changes to the corrective action guidelines and vehicle safety guidelines.

WE WILL adjust, correct or expunge the disciplinary records of affected employees to reflect the CTA's reliance on previous guidelines in imposing discipline rather than reliance on the guidelines implemented in March 2005.

DATE _____

           Chicago Transit Authority
           _____

           (Representative)(Title)

## ILLINOIS LABOR RELATIONS BOARD

320 West Washington, Suite 500
Springfield, Illinois 62701
(217) 785-3155

160 North LaSalle Street, Suite S-400
Chicago, Illinois 60601-3103
(312) 793-6400

### THIS IS AN OFFICIAL GOVERNMENT NOTICE
### AND MUST NOT BE DEFACED.

**STATE OF ILLINOIS**
**ILLINOIS LABOR RELATIONS BOARD**
**LOCAL PANEL**

| | |
|---|---|
| CTA Trade Coalition, | ) |
| | ) |
|         Charging Party | ) |
| and | )    Case No. L-CA-05-039 |
| | ) |
| Chicago Transit Authority, | ) |
| | ) |
|         Respondent | ) |

**AFFIDAVIT OF SERVICE**

I, Missy McDermott, on oath state that I have this 28th day of June, 2006, served the attached ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION AND ORDER issued in the above-captioned case on each of the parties listed hereinbelow by depositing copies thereof in the U.S. mail at 160 North LaSalle Street, Suite S-400, Chicago, Illinois 60601-3103, addressed as indicated and with postage prepaid for certified mail, return receipt requested, except as indicated.

Ms. Michele Cotrupe
Asher, Gittler, Greenfield & D'Alba
200 West Jackson Blvd., Suite 1900
Chicago, IL 60606

Mr. Brad Jansen
Chicago Transit Authority, Law Department
P.O. Box 7564
Chicago, IL 60680-7564

Designated Agent –Missy McDermott- Illinois Labor Relations Board