*in the matter of the*
# ARBITRATION
*between*

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS CHAUFFEURS & HELPERS
Local No. 726

and

CHICAGO TRANSIT AUTHORITY

**Grievance No. 7210-05**
**Peter Demos -- Termination**

### DECISION AND AWARD
### of
### John C. FLETCHER, Arbitrator
### June 6, 2006

This matter came to be heard in the Lake Street offices of the Chicago Transit Authority

on January 26, 2006 and March 2, 2006. The Chicago Transit Authority ("CTA" or "the

Authority") was represented by:

> Carole A. Corns, Esq.
> Chief Attorney -- Law Department -- Labor
> 567 West Lake Street,
> Chicago, Illinois 60661-1498

The Grievant, Mr. Peter Demos and Teamsters Local No. 726 ("the Union" or "Local

726") was represented by:

> James W. Green, Jr., Esq.
> 230 West Monroe Street, Suite 2600
> Chicago, Illinois 60606

Following the conclusion of the evidentiary hearing the counsel for the parties prepared

briefs that were exchanged by the Arbitrator on May 17, 2006.

**Background:**

Pursuant to the terms of the Collective Bargaining Agreement in effect between the CTA

and the Union at the time events giving rise to this grievance occurred, the parties submit the

**EXHIBIT**
**A**

Case 1:08-cv-01886   Document 32-2   Filed 07/24/2008   Page 2 of 19

matter concerning the termination of Peter Demos ("Demos") to the Arbitrator for final and binding determination.

Demos entered the employ of the CTA in 1995, and was assigned as a Service Truck Chauffeur at the time of his discharge on April 27, 2005. As a Service Truck Chauffeur, Demos was responsible for transporting laborers and/or equipment to various work locations on CTA property during his day shift hours of 7:00 a.m. and 3:30 p.m. (Tr. 24.)

On April 13, 2005, the date giving rise to the instant dispute, Demos punched in at CTA's West Shops, at 6:52 a.m. The record establishes that that morning, CTA laborers were conducting a biannual job "pick" at West Shops which was expected to last approximately two hours. Therefore Demos' services as a chauffeur were not immediately needed. According to evidence not in dispute, Demos parked his CTA truck on West Lake Street where work crews normally assemble, then got into his personal vehicle and drove to the area of 2701 West Madison Street where he was arrested by undercover Chicago Police Officers and subsequently incarcerated for soliciting a prostitute. It is also not disputed that Demos failed to notify CTA management of his whereabouts that day, though at approximately 6:30 in the evening he returned to West Shops and explained to the supervisor on duty that he had experienced symptoms of a heart attack that morning and had gone home. Demos also contacted his manager by telephone, and told him the same story. Demos informed his manager that he would not be in the following day, April 14th, because he planned to see his doctor.

Demos returned to work on the morning of April 15th, and was asked by Timothy Cardiff, Utilities Department Senior Coordinator, to submit an Unusual Occurrence Report explaining his unauthorized absence on April 13th. Demos complied, stating the following reasons for leaving work without permission:

Was at my car getting wallet when started to feel sick tight chest pain, sweating, I thought I was having a heart attack – I panicked and left [West Shops].

Carduff accordingly cited Demos for violating General Rules 12 (e), 14 (i) and (w), and for "poor job performance" on the basis that he had left his assigned CTA vehicle unattended and subsequently used his private vehicle on company time, and issued him a Final Written Warning pursuant to CTA Corrective Action Guidelines. However, CTA management later received information that Demos had really been arrested for solicitation on April 13th, and was incarcerated for several hours

Demos ultimately changed his story and admitted that he had been arrested for soliciting a prostitute, though he steadfastly maintained his innocence of all criminal activity. This time, Demos explained to Manager of Labor Relations Eugene Jendrach, that after punching in on April 13th, he had gone for coffee and realized that he had left his wallet in his car. Demos asserted that while retrieving it, he began to feel ill with symptoms of a heart attack, and consequently decided to get into his vehicle and drive 45 minutes to his home in Justice, Illinois "to get his cholesterol pills". Demos then told Jendrach that he was proceeding to the expressway entrance ramp when he spilled coffee on his leg and was forced to pull over to the side of the road. That is when, according to Demos, a woman approached his car and asked him if he wanted a "date". Demos insisted (to Jendrach) that he forcefully declined the offer, but was nonetheless arrested and incarcerated for solicitation. In response to Jendrach's inquiries, Demos did not explain why he had not called for paramedics, why he had not contacted anyone at West Shops to let them know he was leaving, or why he had driven 12 blocks east when there was an entrance ramp much closer to West Shops than the location where he was ultimately arrested. Demos did admit to Jendrach that he initially lied about having gone home, and further that he

had not been truthful when he completed the required Unusual Occurrence Report. However,
explained Demos, he was embarrassed and fearful as a result of the incident, and thus lied to
protect himself from the ridicule of his coworkers and the wrath of his girlfriend.

On April 18, 2005, Jendrach wrote to CTA General Manager Robert Degnan formally
recommending Demos' discharge for the following reasons:

> On April 18, 2005 Service Truck Chauffeur, Peter Demos was interviewed
> at the West Shops concerning a serious behavioral violation that occurred on
> April 13, 2005 and Friday, April 15, 2005.

### Background

> On April 13, 2005 at 7 am, Mr. Demos was assigned Truck 225 with the
> Laborers. The Laborers were picking new assignments that morning and Mr.
> Demos parked Truck 225 on Lake Street. At approximately 0715 hours he left
> the truck, got into his personal vehicle and left the West Shops area. Mr. Demos
> was arrested for soliciting at approximately 0735 by an undercover police officer
> and taken into custody, with his auto being impounded. Mr. Demos left his CTA
> truck abandoned on Lake Street without any follow-up call to the shops about its
> whereabouts.
>
> At approximately 1830 hours on April 13, 2005, Mr. Demos called
> Manager D. Murphy at his home and stated that after reporting for work he was
> not feeling well and left in his own vehicle to go to his home in Justice, Illinois
> because he thought he was having a heart attack. No mention was made of the
> arrest or any subsequent actions. He also told Murphy that he was going to be off
> on Thursday April 13, 2005 because of his illness.
>
> On Friday, April 15, 2005, Mr. Demos was interviewed by T. Carduff
> regarding the abandoned truck incident of Wednesday, April 13, 2005. Mr.
> Demos again related the story of feeling ill and attempting to go home because he
> thought he was having a heart attack. Again, Mr. Demos made no mention of
> being arrested.
>
> Mr. Demos was then issued a Final Written Warning for abuse of
> company time and leaving an assigned work location.
>
> Following receipt of additional information regarding Mr. Demos'
> activities, he was told to report to the West Shops and Mr. Murphy's office at
> 1000 hours on Monday, April 18, 2005 and to secure Union representation for
> that meeting.

## Interview Summary

At the April 18, 2005 interview, Mr. Demos was given a copy of a notice of administrative rights and was asked to sign the document as evidence of his awareness of those rights. He signed the document after some discussion.

Mr. Demos again stated that on Wednesday, April 13, 2005, he was feeling ill and decided to go in his personal auto to home. When asked about the need for paramedics if he felt he was having a heart attack, Mr. Demos had no response.

Mr. Demos stated that he was enroute to the Stevenson expressway via the Damen Ave. entrance ramp when he hit a bump or something and spilled coffee into his lap. He stopped his car immediately. There a woman approached his car and opened the passenger door, asking whether he wanted a date. Mr. Demos stated he said, "No". However she left his passenger door open and he proceeded to yell at her that she could have closed it. Meanwhile, he closed the passenger side door and turned the corner when he was stopped by the Chicago Police and arrested for Soliciting. According to the police report, some mention of $10.00 was expressed regarding a sex act.

Mr. Demos stated that he made no mention of his arrest because he felt embarrassed and would be teased by his fellow workers. He also did not want his girlfriend to know about the events. He admitted that he deliberately withheld information.

\*\*\*

## Rule Violations

In view of the above, it is apparent that on April 13 and 15, 2005, Mr. Demos made false and misleading oral and written statements to members of management concerning his abandonment of Truck 225. These actions are clearly serious behavior violations.

Mr. Demos' actions were not in keeping with an effective or an efficient operation and were in violation of at least the following CTA rules:

| 7 (a,b,c) | Obedience to Rules |
| 12 (e) | Responsibility for Property |
| 14 (e,j) | Personal Conduct |
| 17 | Accident Incident Reports |
| 24 | Use of Best Judgment |

In view of the severity of these charges, Mr. Demos committed serious behavioral violations for failing to inform the Authority of the circumstances surrounding his abandonment of Truck 225 and for making false statements when questioned as to events surrounding the incident.

## Conclusion and Recommendation

Mr. Demos' actions were not in keeping with an effective or efficient operation and were detrimental to the service. It is therefore recommended that Peter Demos be discharged on April 27, 2005.[1]

Based upon Jendrach's recommendations, CTA General Manager Robert Degnan terminated Demos on April 27, 2005, and in due course the instant grievance was presented. The CTA denied the grievance at each step in the established grievance procedure, and it is upon these essential facts that the matter came to be heard by the Arbitrator, free of procedural defect, for a final and binding determination on its merits.

At arbitration, Demos maintained his innocence of all criminal activity on April 13, 2005, though he admitted again that he had initially lied to CTA management about where he had spent the better part of the day. Demos also insisted that he truly had been ill with heart attack symptoms that morning, and produced a written statement allegedly signed by his doctor, indicating that he had made several attempts to make an appointment the following day.[2]

Undercover Chicago Police Officer Stephanie Gonzalez also testified at arbitration, asserting that at approximately 7:30 a.m. on April 13, 2005, Demos stopped his vehicle near a street corner where she was posing as a prostitute, and made deliberate eye contact with her. According to Gonzalez, she therefore approached the driver's side of Demos' vehicle and asked him if he was looking for a "date". Gonzalez testified unequivocally that Demos responded in the affirmative. Gonzalez did not subsequently testify as to the exact nature of their consequent

---

[1] Joint Exhibit 6.
[2] At arbitration, CTA counsel objected to the admission of Dr. Coleman's alleged statement into evidence, because Dr. Coleman was not present to testify as to its authenticity. (Tr. 67.)

arrangement, however her arrest report containing a description of it was entered into evidence as Joint Exhibit 11. Union counsel challenged the document only to the extent that "hearsay was involved". (Tr. 20.)

Ironworker Helper and Union Steward Thomas Respondi testified for the Union. Respondi testified as to an occasion when he, himself, had been subject to discharge pursuant to CTA Corrective Action Guidelines for allegedly falsifying payroll documents. According to Respondi, he received a 29-day suspension for his alleged misconduct, which was subsequently reduced, by agreement between the parties, to a 3-day suspension. Respondi also testified that two other employees similarly charged were not terminated, but were assessed 29-day suspensions.

## THE ISSUE

The parties stipulated that the issue to be decided by the Arbitrator is:

Did the CTA have just cause to terminate Mr. Peter Demos on April 27, 2005, and if not, what shall be the remedy?

## RELEVANT CONTRACT AND WORK RULE PROVISIONS

### SECTION 1.5 – NON-INTERFERENCE

The Authority shall be a liberty at all times during the existence of this Agreement and subject to provisions hereof, to operate its property according to its best judgment and the orders of lawful authority. The Union agrees that it will in no way interfere with or limit the right of the Authority to discharge or discipline its employees where sufficient cause can be shown.

### GENERAL RULE BOOK

Rule 12 (e) – Responsibility for Property

(e)    Employees must safeguard the Authority's property

Rule 14 (e,j,w) – Personal Conduct

(e)    Conduct unbecoming an employee

(j)    Falsifying any written or verbal statement

(w)    Abuse of company time; poor work performance

Rule 17(a) – Accident Incident Reports

(a)    … Employees must not falsify any reports

Rule 18(a) – Reporting for Duty

(a)    Employees must not change their scheduled working hours, assignments or duties unless authorized to do so by the appropriate supervisor. Tardiness or unauthorized early departure is not permitted.

Rule 24 – Use of Best Judgment

Should a situation requiring prompt action arise which is not covered by the rules in the General Rule Book, specialized rule books, executive orders, bulletins or instructions, the employees involved must use their best judgment in selecting the best course of action to follow, then report the action taken to appropriate supervision as soon as possible thereafter.

## CORRECTIVE ACTION GUIDELINES

I.    Behavioral Violations/Corrective Actions

The following violations are subject to immediate discharge:

* Making untrue, dishonest or misleading reports (falsification)

## POSITIONS OF THE PARTIES

### The Position of the Authority:

At the outset, the CTA argues that Demos made false and misleading statements, a fact wholly substantiated in this record by his own admission. There is no dispute, argues the CTA, that Demos was arrested at 2701 W. Madison on the morning of April 13, 2005, and was subsequently incarcerated for soliciting a prostitute. There is further no dispute, notes the CTA, that Demos told his manager that he had gone home sick that morning, and later admitted that his

Case 1:08-cv-01886 Document 32 Filed 07/24/2008 Page 9 of 19

statements were untrue. "There could not be a clearer case of an employee providing false and misleading information", argues the CTA. The CTA is not persuaded in Demos' favor by the fact that he eventually told the truth about spending the day in jail, arguing that his belated confession and his stated excuses for lying in the first place, should not absolve him of responsibility for violating the General Rules referenced in his April 27, 2005 notice of termination. In support, the CTA cites CTA and Amalgamated Transit Union, Local 241, Cassanya-Harrison grievance, in which Arbitrator Cox upheld the discharge of a CTA bus operator who was terminated for making false and misleading statements pertaining to a bus accident, even though she ultimately confessed to the truth.

As to the sanction of termination, the CTA argues that it was entirely appropriate given the facts in this case. Not only is there ample arbitral support for termination in instances of proven falsification in other industries, argues the CTA, Demos' termination was entirely consistent with CTA's own Corrective Action Guidelines which expressly provide that an employee found to have made "untrue, dishonest or misleading reports" is subject to immediate discharge.[3]

The CTA also argues that the Union has not established that Demos was treated differently than other employees who engaged in similar misconduct. The CTA rejects the Union's attempt to compare him to Thomas Respondi, who testified that in 1997 he and a number of other drivers were accused of leaving work early on two occasions but were not discharged despite management's recommendations. Demos is not similarly situated to

---

[3] Joint Exhibit 8 at page 7. See also; W. R. Grace & Co. and United Steelworkers of America, Local 863, 89 LA 999, 1003 (Galambos, 1986), citing Kroger Co. and International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local 249, 44 LA 915, 917 (Cahn, 1965).

Respondi and the others, argues the CTA; they were disciplined by a different manager, during a different time frame, and for entirely different rules violations.

In sum, the CTA argues that, "The Corrective Action Guidelines, General Rule Book and applicable arbitration opinions clearly state that falsification is an immediate dischargeable offense. By his own admission, Demos provided conflicting reports to CTA management concerning a serious incident. CTA was well within its rights to discharge Demos." For those and all the foregoing reasons, then, the CTA urges the Arbitrator to deny the instant grievance in its entirety.

## The Position of the Union

The Union argues that the CTA did not have just cause to terminate Demos, because it failed to consider both his length of service and his lack of prior discipline as mitigating factors meriting progressive discipline. There is no evidence, argues the Union, that CTA General Manager Robert Degnan considered Demos' 10 years of discipline-free service before discharging him. Moreover, argues the Union, "[The CTA] has not followed its past practice of following progressive discipline as applied to other employees." In support, the Union notes that 14-year employee Tom Respondi had previously been charged with falsifying time records, and had been assessed a 29-day suspension which was ultimately reduced to a 3-day suspension. Moreover, notes the Union, two other employees charged with similar offenses were "automatically given 29 day suspensions and returned back to work." Termination, maintains the Union, was not even considered by the CTA in those cases. On this point, then, the Union argues that the CTA responded more severely to Demos than it did to other employees "whose conduct was more egregious...".

The Union notes that Demos admitted giving a false statement to his supervisors regarding his whereabouts on April 13, 2005. "His conduct, while inappropriate", notes the Union, "did not rise to the same level of conduct as that of Mr. Respondi [and other similarly situated employees]... clearly their conduct was deliberate." Unlike those employees, maintains the Union, Demos made his statements "out of fear that his fiancée and colleagues would find out about his arrest..." Demos, argues the Union, admitted being "AWOL" for the entire day of April 13th, and moreover acknowledged leaving his truck unattended. Yet, notes the Union, management was prepared to issue him a mere letter of warning until he fully disclosed the circumstances of his arrest and detention. Thus, reasons the Union, "[The] conduct for which he was terminated was not being AWOL or abandoning a vehicle, but the act of not fully disclosing his whereabouts." Clearly, insists the Union accordingly, the CTA was much more lenient with Mr. Respondi and the others than with Demos.

In sum, the Union argues that the CTA has not met its burden to prove that Demos' termination was justified. "As an employee with ten years seniority and no history of discipline, argues the Union, "Mr. Demos was entitled to receive a lesser form of discipline consistent with the Employer's internal disciplinary guidelines and past practice..." For all the foregoing reasons, then, the Union urges the Arbitrator to sustain the grievance in its entirety and grant the relief requested.

## DISCUSSION AND ANALYSIS

After scrutinizing this record and the arguments of the parties, the Arbitrator is persuaded that the Authority was justified in terminating Demos' employment. There is no real question that on the morning of April 13, 2005, Demos abandoned his post and his CTA vehicle, and was subsequently arrested and charged with soliciting a prostitute while he was still on duty and on

the clock. It is also clear that Demos lied to CTA officials about the circumstances of his unauthorized absence on that date, and continued to do so until his arrest became a matter of public record and thus came to management's attention. However, and this is slightly though not fatally problematic, there is also unchallenged evidence that before Demos' fabrication became known to management, the CTA issued him a mere letter of warning (consistent with the fact that he had incurred no prior discipline) rather than a substantive sentence for serious misconduct.

While it is true that the CTA charged Demos with violating General Rule 7 (Obedience to Rules), General Rule 12 (Responsibility for Property), and General Rule 24 (Use of Best Judgment) in its discharge recommendation, testimony and evidence presented at arbitration clearly establishes that management overwhelmingly relied on his alleged violation of Sections (e) and (j) of General Rule 14 (Personal Conduct) and Section (a) of General Rule 17 (Accident Incident Reports) as a basis for terminating his employment. It is a known fact that Demos abandoned his CTA vehicle on Lake Street for an entire day, and thus "failed to safeguard the Authority's property" (Rule 12 e). Moreover, the record leaves little doubt that Demos failed to "obey rules", and most certainly failed to exercise "best judgment". For all of those infractions, however, management was prepared to sanction him with a letter of warning; that is, until additional information came to light proving that Demos had lied about why he had abandoned his post and failed to safeguard CTA property. Thus, the Arbitrator concludes that the real heart of the matter in this case, is not whether Demos' going AWOL on April 13th constituted even partial grounds for his termination. Clearly, it did not. Instead, the Arbitrator concludes that the issue to be decided is whether or not Demos was unreasonably sanctioned for lying about the

reason for his disappearance, and further whether management responded inappropriately to the nature of the incident prompting Demos' unauthorized absence and subsequent arrest.

As to the first question, the Arbitrator duly considered two primary factors in the context of the CTA's April 18, 2005 Recommendation for Discharge; Demos' essential credibility as a witness in light of record proofs, and the Union's proposed evidence of disparate treatment. First, the CTA has persuasively argued that the Union cannot, and in fact does not, dispute that Demos provided conflicting verbal and written statements to management. There is unchallenged record evidence that on the morning of April 13, 2005, he was arrested at 2701 W. Madison Street for soliciting a prostitute, yet he told his manager later that evening that he had gone home because he thought he was having a heart attack. Two days later, Demos filed a written "Unusual Occurrence Report" similarly contending as follows:

> Was at my car getting wallet when I started to feel sick tight chest pain, sweating. I thought I was having a heart attack – I panicked and left [West Shop].[4]

While Demos later admitted that he initially lied about his real whereabouts on April 13, 2005 (i.e. that he had spent the entire day in jail for soliciting a prostitute) for fear of suffering embarrassment, he steadfastly claimed that he had, in fact, left work that morning due to illness. Demos also consistently maintained his innocence of any criminal wrongdoing on that date.

To the end, Demos contended that after punching in at West Shops, he went to his vehicle to retrieve his wallet, and began experiencing symptoms of a heart attack. Somewhat incredibly, testified Demos, he decided to drive home to Justice (some 45 minutes away) and get his "cholesterol pills" even though he felt "weird", "shaky", and "scared". (Tr. 54.) Demos also persevered in alleging that enroute to the freeway, he accidentally spilled coffee on his leg, and

---

[4] Joint Exhibit 2.

was stopped at the side of the road when he was solicited for sex by someone whom he assumed was a prostitute. Demos faithfully maintained that he summarily rejected the individual's offer, yet he acknowledged at arbitration (with no apparent surprise or outrage), that he was nevertheless arrested and booked into jail by undercover police officers.     Whether or not Demos' story is actually true, urges the Union, is immaterial, because, "When the CTA charged him, there was absolutely no reference to this incident or the underlying events of that incident…" (Tr. 9.)  However, the record before the Arbitrator is clear; Demos was charged with falsifying his verbal and written accounts of April 13, 2005, and he was also charged with conduct unbecoming an employee.  The truth of his alleged illness and subsequent arrest for solicitation are thus entirely relevant to the Arbitrator's analysis of whether or not the CTA had just cause to terminate his 10-year employment.

It is axiomatic that, "It is within the province of the arbitrator to determine the weight, relevance, and authenticity of evidence."[5]  Moreover, according to *Elkouri*:

> "The general approach of arbitrators in giving weight and credibility to evidence is effectively illustrated by a statement made by an arbitrator in reviewing the discharge of an employee. He noted that the case was illustrative of the type of situation in which the facts are to a large extent determined by the weight and credibility accorded to the testimony of the witnesses and to the documentary evidence offered by the parties."[6]

Likewise, this Arbitrator concludes that his judgment as to whether or not the CTA had just cause to terminate Demos for violating General Rules 12 and 17, must be reached in context of the weight and credibility of all testimony and documentary evidence.  In this particular case, Demos' testimony indeed stretches credulity, and moreover, the "documentary evidence" he

---

[5] How Arbitration Works, Sixth Edition; (2003),Elkouri and Elkouri, page 413.
[6] Id at page 414.

produced at arbitration in support of his assertion that he repeatedly attempted to see his doctor on April 14, 2005, is suspect.

Up to and during the arbitration hearing, Demos steadfastly denied soliciting a prostitute on April 13, 2005. However, record evidence convinces the Arbitrator to the contrary. Undercover Police Officer Stephanie Gonzalez testified that on that date, Demos made deliberate eye contact with her as he stopped his car (ostensibly to deal with his spilled coffee), and subsequently accepted her offer for sex in exchange for money. She was unequivocal in her testimony, and the Union, in the opinion of the Arbitrator, failed to impeach her as a credible witness. Moreover, the Arbitrator credits Gonzalez's testimony over that of Demos, primarily because Gonzalez had no apparent motive to be untruthful. In fact, in the opinion of the Arbitrator, Gonzalez had everything (her career) to lose by lying, while Demos had everything (re-employment) to gain. Rather than attempting to impeach Gonzalez, then, the Union instead attempted to understate the significance of Demos' arrest by contending that the resulting criminal charge of solicitation was ultimately "dismissed". In the end, even this proved to be untrue. Testimony at arbitration established that the charge of solicitation was deferred, and thus "could theoretically be reinstated at a later date." (Tr. 13.)

Then, of course, there is the matter of Demos' alleged illness. Demos testified that on the morning of April 13, 2005, he "felt real funny, like real hot and sweating and tightness" (Tr. 54), yet, according to this record, he failed to seek immediate medical attention, and told no one, including management or even Officer Gonzalez, of his alleged symptoms. Demos testified that though he feared he was having a heart attack, he decided to take his coffee, get into his car, and drive some 45 minutes to his home for "cholesterol pills". Demos also testified that "this had happened quite a few times" already, yet there is absolutely no evidence before the Arbitrator

that he was ever evaluated by a doctor either before or after April 13, 2004. Demos did testify that he "tried to get in to a doctor because [he] was worried about his chest" (Tr. 65), but maintained that his doctor was "too busy" to see him. This assertion, too, strains credulity. The Arbitrator finds it highly improbable that any doctor would have urged Demos to ignore his life-threatening symptoms simply because of a full schedule at the office. Indeed, even if Demos' doctor really had been "too busy" to fit him in, the Arbitrator is confident that he would either have urged Demos to seek immediate emergency medical care, or at the very least prompted him to seek out another doctor.

At arbitration, Demos did produce an alleged "affidavit" dated October 13, 2005 from Mark Coleman, M.D., stating as follows:

To Whom It May Concern,

As my records show, Mr. Demos called our office on April 14, 2004 numerous times for an appointment. Due to a booked schedule, my office was unable to give him an appointment.

If you have any questions please contact my office.[7]

CTA counsel objected to the introduction of the above document, on the basis that Dr. Coleman was not present at arbitration to authenticate it. (Tr. 67.) The Arbitrator, as is his customary practice, nevertheless accepted it "for what it was worth" (Tr. 68), and upon later scrutiny, found it to be suspect at the very least, if not entirely false. Dr. Coleman's alleged statement was printed under nonprofessional letterhead, which in and of itself is really neither here nor there. However, the address of the doctor's office as printed in the letterhead, contained a typographical error. The City of Lagrange, Illinois was misspelled as "Lagrane, IL.". While he makes no definitive factual finding that Dr. Coleman's office could not possibly have made

---

[7] Union Exhibit 2.

(or missed) such an error in its letterhead, the Arbitrator certainly finds it *unusual*, after having examined literally hundreds, perhaps thousands, of similar doctors' statements in his nearly half century exposure to them as a labor advocate, management advocate, and nearly a quarter century as an arbitrator. Accordingly, as he is privileged to do, the Arbitrator finds the Union's "documentary evidence" of Demos' alleged attempts to visit his doctor of little or no value based upon its questionable veracity and a further lack of record evidence that he, even to this day, has ever been evaluated by Dr. Coleman or anyone else for a potentially life-threatening heart condition.

As to the matter of alleged disparate treatment, the Arbitrator duly considered the Union's evidence that other bargaining unit employees accused of falsifying reports were not summarily terminated as was Demos. Under other circumstances, the Arbitrator might have been persuaded to consider the CTA's treatment of Demos unduly harsh and inconsistent with past practice. However, Demos' discharge was entirely in keeping with CTA's Corrective Action Guidelines which expressly state that employees "making untrue, dishonest or misleading reports" are subject to immediate discharge. Moreover, the employees cited by the Union in support of its assertion of disparate treatment, were charged with an entirely different type offense (falsifying payroll documents). Indeed, as the CTA maintained, in order for an affirmative argument of disparate treatment to prevail, the Union must demonstrate that employees involved in similar or identical misconduct have been dealt with differently. While "falsification" was indeed involved in the other scenarios presented by the Union at this arbitration, the Arbitrator finds the actual circumstances of Demos' infractions to be substantively different. Furthermore, any leniency the CTA may have shown to Respondi and the other employees involved in the alleged payroll record falsification, is beyond the scope of

the Arbitrator. CTA Corrective Action Guidelines expressly state that employees making false and misleading written or verbal statements to management are subject to immediate discharge. Thus, CTA's action with regard to Demos was neither arbitrary nor capricious in light of his proven verbal and written dishonesty.

Thus, the only question remaining is whether or not the CTA may have responded inappropriately to the nature and extent of Demos' misconduct by summarily discharging him. In other words, had Demos gone to Wrigley Field and lied about it instead of soliciting a prostitute (and getting arrested) and lying about it, would the CTA still have had grounds to discharge him? Pursuant to CTA Corrective Action Guidelines, the Arbitrator is persuaded in the affirmative, though perhaps management would have found some lesser penalty (in light of Respondi et. al.) more fitting. Indeed, it is true that the CTA's case in chief centered on Demos' false statements and his lack of credibility with respect to his alleged illness, and the Union obviously banked on this fact when it promulgated its disparate treatment argument. However, the record clearly establishes that Demos was also charged with "conduct unbecoming an employee". While exactly what constitutes "unbecoming conduct" in any given situation is inherently subjective and a matter of context, the Arbitrator is certainly convinced that soliciting a prostitute while on duty qualifies as such under any circumstances. There is absolutely no question that even though Demos was not on CTA property or operating a CTA vehicle at the time of his arrest, he was still on the clock. In fact, Demos himself testified that he opted not to inform his supervisor of his alleged illness because he "was just going to run home and get [his] pills and come right back." (Tr. 55.) Thus, even Demos acknowledged that he was still on duty and on the clock when he departed West Shops in his personal vehicle, and had he returned

before the laborers finished their "pick" (as was his evident plan), no one would have been the wiser.

Upon the whole of this record, then, the Arbitrator is persuaded that Demos was indeed guilty of "making untrue, dishonest and misleading reports" about the events of April 13, 2005, and was thus subject to immediate discharge pursuant to the CTA's Corrective Action Guidelines. Moreover, the Arbitrator is convinced that the nature and extent of Demos misconduct was, in and of itself, capital. The necessary nexus between his off-property crime (charges against him were never dismissed) and his employment relationship with the CTA was satisfied in this case, given the fact that the illegal activity occurred while he was on duty and on the clock. Thus, for all the foregoing reasons, the record has established to the satisfaction of the Arbitrator that the CTA had just cause to terminate Peter Demos. Accordingly, the instant grievance must be, and is, denied in its entirety.

## CONCLUSION AND AWARD

For the foregoing reasons and incorporated herein as if fully rewritten, the grievance is denied. CTA's termination of Peter Demos' employment was justified, it will not be disturbed.

John C. Fletcher, Arbitrator

Poplar Grove, Illinois, June 6, 2006